PARIS SAVINGS & LOAN ASSOCIATION, Appellant,

v.

Ron WALDEN, Appellee.

No. 05–86–00917–CV.

Court of Appeals of Texas, Dallas.

April 16, 1987.

Rehearing Denied June 1, 1987.

Steven A. Harr, Dallas, for appellant.

Frank L. Broyles, Irving, Thomas K. Boone, Dallas, for appellee.

Before STEPHENS, DEVANY and STEWART, JJ.

STEPHENS, Justice.

This is an accelerated appeal from the granting of a temporary injunction in which the trial court enjoined Paris Savings & Loan Association (Paris) from presenting, and Fox and Jacobs Employee Credit Union (Fox and Jacobs) from paying, a $100,000 letter of credit. In four points of error Paris argues that: (1) the trial court erred in issuing the temporary injunction because Paris is a holder in due course of the promissory note made by Ron Walden (Walden) and accordingly, is not subject to Walden's claims or defenses to the note; (2) the trial court erred in issuing the temporary injunction because there was no evidence or insufficient evidence of "fraud in the transaction"; (3) the trial court erred in issuing the temporary injunction because there was no evidence or insufficient evidence that Walden would suffer irreparable injury and have no adequate remedy at law; and (4) the trial court erred in issuing the temporary injunction because Paris properly presented demand for payment under the terms of the letter of credit. We agree with Paris' second point of error. Consequently, we reverse the judgment of the trial court.

Longcrier Farms (Longcrier), a ranching operation started in 1980, entered into a contract with Walden in October 1984, whereby Walden agreed to purchase from Longcrier twenty-five purebred cattle embryos. Longcrier was to produce the embryos from the semen of quality bulls and the eggs of quality mother cows. The embryos would then be transplanted into ordinary, recipient cattle to be carried through pregnancy to birth. Several investors, in addition to Walden, entered into similar contracts with Longcrier. In connection with his purchase of the cattle embryos from Longcrier, Walden executed a $100,000 promissory note (the embryos were $4,000 each), and provided a letter of

credit issued by Fox and Jacobs in the same amount. The note was made payable to Sabine Capital Corporation (Sabine), a financing affiliate of Longcrier. The letter of credit originally designated Sabine Capital Corporation as beneficiary. The other investors executed similar promissory notes, and likewise obtained various letters of credit.

In November 1984, Paris made a loan to Sabine in the principal amount of $796,400. As collateral for the loan, Sabine transferred several of the investors' notes and letters of credit, including Walden's, to Paris. The loan proceeds were to be used by Sabine to fund the operational needs of Longcrier.

Longcrier declared bankruptcy in December 1985. Walden never received his cattle embryos. Walden states in his brief, though not contained in the record on this appeal, that in June 1986, he filed an action for rescission and declaratory judgment against Paris, alleging fraud, failure of consideration, and violations of securities laws. Walden defaulted in his payment of interest due on his note in April 1986. On June 30, 1986, Paris presented a demand to Fox and Jacobs, attempting to draw the entire $100,000 under the letter of credit. Walden filed suit against Paris to enjoin the payment by Fox and Jacobs to Paris under the letter of credit. On July 3, 1986, a temporary restraining order was issued enjoining payment by Fox and Jacobs to Paris of the amount of the letter of credit. Following a hearing, the trial court issued a temporary injunction preventing Fox and Jacobs from payment of the letter of credit and preventing Paris from making any further attempt to collect under the letter of credit.

■ The parties agree that Texas Business and Commerce Code, section 5.114 governs this appeal. Section 5.114 provides in relevant portion:

> (a) An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the cus-

tomer and the beneficiary. The issuer is not excused from honor of such a draft or demand by reason of an additional general term that all documents must be satisfactory to the issuer, but an issuer may require that specified documents must be satisfactory to it.

> (b) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title (Section 7.507) or of a certified security (Section 8.306) or is forged or fraudulent or there is fraud in the transaction:

> > (1) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course (Section 3.302) and in an appropriate case would make it a person to whom a document of title has been duly negotiated (Section 7.502) or a bona fide purchaser of a certified security (Section 8.302); and

> > (2) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.

TEX.BUS. & COM.CODE ANN. § 5.114 (Tex.U.C.C.) (Vernon 1968 & Supp.1986). Section 5.114(a) sets forth "a cardinal principle" of letter of credit law that the obligation of the issuer bank to pay the beneficiary of a letter of credit upon presentment of conforming documents is independent of the underlying contractual relationship between the customer and the beneficiary. *GATX Leasing Corp. v. DBM Drilling Corp.*, 657 S.W.2d 178, 181 (Tex.App.—San Antonio 1983, no writ); *see Republic National Bank of Dallas v. Northwest National Bank of Fort Worth*, 578 S.W.2d 109, 114 (Tex.1978). The rationale behind

this "cardinal principle" of letter of credit law was explained by one court:

> The great utility of letters of credit flows from the independence of the issuer-bank's engagement from the underlying contract between beneficiary and customer. Long-standing case law has established that, unless otherwise agreed, the issuer deals only in documents. If the documents presented conform to the requirements of the credit, the issuer may and must honor demands for payment, regardless of whether the goods conform to the underlying contract between beneficiary and customer. Absent its agreement to the contrary, the issuer is, under the general rule, not required or even permitted to go behind the documents to determine if the beneficiary has performed in conformity with the underlying contract.

*Intraworld Industries, Inc. v. Girard Trust Bank,* 461 Pa. 343, 357, 336 A.2d 316, 323 (1975). Under the general rule set forth in section 5.114(a), when conforming documents are presented, payment must be made. *GATX,* 657 S.W.2d at 181.

An exception to the general rule is set forth in subdivision (b) of section 5.114. Under the limited circumstances established by section 5.114(b), subsection (2) provides that the issuer has the option to honor or dishonor, or the customer may enjoin the issuer from honoring, such a draft. *Siderius, Inc. v. Wallace Co.,* 583 S.W.2d 852, 859 (Tex.Civ.App.—Tyler 1979, no writ).

▉ Appellate review of the trial court's granting of a temporary injunction is limited to the narrow question of whether the trial court abused its discretion in granting the injunction. *See Davis v. Huey,* 571 S.W.2d 859, 861–62 (Tex.1978); *Keystone Life Insurance Co. v. Marketing Management, Inc.,* 687 S.W.2d 89, 90 (Tex.App.—Dallas 1985, no writ). A court may enjoin an issuer from honoring a letter of credit in the three limited circumstances set forth in section 5.114(b): first, "when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform ..."; second,

when "a required document ... is forged or fraudulent"; and third, "where there is fraud in the transaction." TEX.BUS. & COM.CODE ANN. § 5.114(b) (Tex.UCC) (Vernon Supp.1986). Walden alleged fraud in the transaction in his application for a temporary restraining order and temporary injunction, thereby attempting to fall within the third set of circumstances to which section 5.114(b) is applicable.

Paris, in its second point of error, complains that "[t]he trial court erred in issuing the temporary injunction for the reason that there was no evidence or insufficient evidence of fraud in the transaction." We will review the record before us to determine whether the trial court erred in finding evidence of "fraud in the transaction" and therefore abused its discretion in granting an injunction under section 5.114(b)(2), based on a finding of "fraud in the transaction."

The Texas Supreme Court has not ruled on the proper standard to be applied in determining whether there has been "fraud in the transaction" under section 5.114(b). Texas courts of appeals that have ruled on the question have followed the "fraud in the transaction" standard enunciated in *GATX,* 657 S.W.2d at 182–83. *See Philipp Brothers, Inc. v. Oil Country Specialists, Ltd.,* 709 S.W.2d 262, 264–65 (Tex.App.— Houston [1st Dist.] 1986, writ dism'd). The *GATX* court noted that section 5.114(b)(2) codifies pre-code law, and stated that an "egregious kind of fraud must be established to obtain a valid injunction under 5.114(b)(2)." *GATX,* 657 S.W.2d at 182. The *GATX* court then adopted the standard set forth in *Intraworld Industries, Inc. v. Girard Trust Bank,* 461 Pa. 343, 357–61, 336 A.2d 316, 324–25 (1975), as properly effectuating the purposes of section 5.114(b)(2) in light of pre-code case law. The *Intraworld* standard for "fraud in the transaction" under section 5.114(b)(2) provides:

> In light of the basic rule of independence of the issuer's engagement and the importance of this rule to the effectuation of the purposes of the letter of credit, we think that the circumstances which

will justify an injunction against honor must be narrowly limited *to situations of fraud in which the wrongdoing of the beneficiary has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served.*

*Intraworld,* 336 A.2d at 324 (emphasis added).

A discussion of facts that have been found to constitute "fraud in the transaction" under section 5.114(b) by applying the standard set forth above will be helpful at this point. The leading case is *Sztejn v. J. Henry Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941). Although *Sztejn* is a pre-code case, section 5.114(b)(2) codified "pre-code case law as articulated in *Sztejn.*" *Siderius,* 583 S.W.2d at 860. The facts of *Sztejn* are set forth in *Intraworld* as follows:

In that case, [*Sztejn*], the customer sought an injunction against the issuer of a letter of credit restraining honor of a draft drawn by the beneficiary. The customer had contracted to purchase a quantity of bristles from the beneficiary and arranged to have the issuer issue a letter of credit in favor of the beneficiary. The credit required that the draft be accompanied by an invoice and bill of lading.

The beneficiary placed fifty cases of merchandise on a steamship and obtained a bill of lading describing the material as bristles. The beneficiary then drew a draft and presented it, along with the required documents, through a collecting bank. The customer's complaint alleged that the material shipped was not bristles as described in the documents, but rather "cowhair, other worthless material and rubbish [shipped] with intent to simulate genuine merchandise and defraud the plaintiff...."

The collecting bank moved to dismiss the complaint for failure to state a cause of action. The court, assuming the pleaded facts to be true, denied the motion. The court recognized that the issuer's obligation was independent from the underlying contract between the customer and beneficiary. That independence is predicated, however, on the genuineness of the documents. The court noted:

"This is not a controversy between the buyer and seller concerning a mere breach of warranty regarding the quality of the merchandise; on the present motion, it must be assumed that the seller has intentionally failed to ship any goods ordered by the buyer."

177 Misc. at 721, 31 N.Y.S.2d at 634. When the beneficiary has *intentionally shipped no goods at all, the court held, the documentation was not genuine and therefore the predicate of the independence of the issuer's engagement was removed.*

*Intraworld,* 336 A.2d at 325 (emphasis added).

Hence, in *Sztejn,* an injunction was allowed when the beneficiary of the letter of credit shipped rubbish instead of the agreed-upon goods. Clearly, in *Sztejn,* the letter of credit was a vehicle used by the beneficiary in an attempt to perpetrate fraud on the customer. In *Sztejn,* the fraudulent wrongdoing of the beneficiary so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation were no longer served. Hence, the *Sztejn* facts justified the issuance of an injunction.

In *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* the following facts justified the issuance of an injunction:

In April, 1971 appellant Cambridge Sporting Goods Corporation (Cambridge) entered into a contract for the manufacture and sale of boxing gloves with Duke Sports (Duke), a Pakistani corporation. Duke committed itself to the manufacture of 27,936 pairs of boxing gloves at a sale price of $42,576.80; and arranged with its Pakistani bankers, United Bank Limited (United) and The Muslim Commercial Bank (Muslim), for the financing of the sale. Cambridge was requested by these banks to cover payment of the purchase price by opening an irrevocable letter of credit with its bank in New

York, Manufacturers Hanover Trust Company (Manufacturers). Manufacturers issued an irrevocable letter of credit obligating it, upon the receipt of certain documents indicating shipment of the merchandise pursuant to the contract, to accept and pay, ninety days after acceptance, drafts drawn upon Manufacturers for the purchase price of the gloves.

Following confirmation of the opening of the letter of credit, Duke informed Cambridge that it would be impossible to manufacture and deliver the merchandise within the time period required by the contract, and sought an extension of time for performance until September 15, 1971 and a continuation of the letter of credit, which was due to expire on August 11. Cambridge replied on June 18 that it would not agree to a postponement of the manufacture and delivery of the gloves because of its resale commitments and, hence, it promptly advised Duke that the contract was cancelled and the letter of credit should be returned. Cambridge simultaneously notified United of the contract cancellation.

Despite the cancellation of the contract, Cambridge was informed on July 17, 1971 that documents had been received at Manufacturers from United purporting to evidence a shipment of the boxing gloves under the terms of the cancelled contract. The documents were accompanied by a draft, dated July 16, 1971, drawn by Duke upon Manufacturers and made payable to United, for the amount of $21,288.40, one-half of the contract price of the boxing gloves. A second set of documents was received by Manufacturers from Muslim, also accompanied by a draft, dated August 21, and drawn upon Manufacturers by Duke for the remaining amount of the contract price.

An inspection of the shipments upon their arrival revealed that Duke had shipped old, unpadded, ripped and mildewed gloves rather than the new gloves to be manufactured as agreed upon. Cambridge then commenced an action against Duke in Supreme Court, New York County, joining Manufacturers as a party, and obtained a preliminary injunction prohibiting the latter from paying drafts drawn under the letter of credit. . . .

*United Bank Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 256, 392 N.Y. S.2d 265, 268, 360 N.E.2d 943, 946 (1976). Clearly, in *United Bank*, the fraudulent wrongdoing of the beneficiary so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation were no longer served. Hence, the *United Bank* facts justified the issuance of an injunction.

In *Philipp Brothers*, the trial court's granting of a temporary injunction was upheld by the court of appeals based on the following facts:

Phibro [Philipp Brothers] agreed to place on consignment with OCS both threaded and unthreaded oil field casing pipe worth approximately $15 million.

\*     \*     \*     \*     \*     \*

Phibro's representations about the quality of the pipe were incorporated into the contract.

\*     \*     \*     \*     \*     \*

OCS was obligated to purchase the pipe only as it made sales to customers. In return, the contract required OCS to pay a "restocking" fee at a rate of 10% per year on that portion of the pipe that remained in inventory and on consignment in the event OCS terminated the consignment agreement or otherwise defaulted on the contract. To secure OCS's payment of the restocking fee, OCS caused TCB to issue the standby letter of credit.

By a June 19, 1985, amendment to the original consignment agreement, which was executed one day before the original contract became effective, Phibro released OCS from any requirement to pay a consignment fee on the threaded pipe in inventory, and Phibro was given the right to sell from the threaded inventory without obtaining OCS's prior approval. Under the amendment, OCS was no longer required to purchase the threaded pipe from the Phibro inventory unless OCS

had first determined the threaded pipe to be "merchantable." If OCS determined the threaded pipe to be merchantable, it was to buy the threaded inventory prior to threading and selling any other similar grade and size plain-end material then in the inventory, and to pay Phibro an "interest payment" in addition to the purchase price of the threaded pipe.

On August 15, 1985, OCS sent Phibro a letter stating its intention to cancel the contract, claiming that Phibro's pipes did not conform to the contract specifications. Phibro responded that it needed to take delivery of the remaining inventory and demanded from OCS $1,659,-722.08 (10% of the worth of the remaining inventory) as the restocking fee under the contract. When OCS failed to pay Phibro the restocking fee, Phibro attempted to draw on the letter of credit. OCS filed suit to enjoin Phibro from presenting, and TCB from honoring, the draft. The trial court granted the injunction. Phibro appeals.

*Philipp Brothers,* 709 S.W.2d at 263–64. The court of appeals in *Philipp Brothers* went on to state:

> Fraud claims should not become surrogates for breach of warranty claims, but Phibro has not demonstrated that the trial judge abused his discretion in granting the temporary injunction. Even disregarding the evidence as to the threaded pipe, there is enough evidence to support a finding that the substandard conditions of the pipe were pervasive enough to *render the entire inventory virtually worthless*, thus destroying the legitimate purposes of the letter of credit. Accordingly, appellant's first point of error is overruled.

*Philipp Brothers,* 709 S.W.2d at 265 (emphasis added). In *Philipp Brothers,* the fraudulent wrongdoing of the beneficiary so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation were no longer served. Hence, the *Philipp Brothers* facts justified the issuance of an injunction.

Before we review the record before us to determine whether the trial court abused its discretion in finding evidence of "fraud in the transaction," we point out that the case at bar is unique in that this case involves two underlying transactions: first, the transaction between Walden, Sabine, and Longcrier; and second, the transaction between Sabine and Paris. The classic fact pattern concerning the enjoinment of a letter of credit occurs when there is only *one* allegedly fraudulent underlying transaction, and the *original beneficiary* of the letter of credit, who was a party to the allegedly fraudulent transaction, seeks to enforce the letter of credit. *See Philipp Brothers,* 709 S.W.2d at 262; *GATX,* 657 S.W.2d at 178; *Siderius,* 583 S.W.2d at 852; *Intraworld,* 336 A.2d at 316; *Sztejn,* 31 N.Y.S.2d at 631.

We now turn to a discussion of the evidence presented to the trial court to explain the basis for our holding that there is no fraud in either of the transactions involved in the case at bar of the degree required to establish "fraud in the transaction" under section 5.114(b).

### The First Transaction

The initial transaction between Walden, Sabine, and Longcrier occurred in October 1984. The parties agree that in October 1984 Walden "invested" in the Longcrier cattle embryo program. Prior to investing in Longcrier's program, Walden obtained from Longcrier several brochures and a prospectus.

Walden studied the information he received, consulted his CPA, and conversed with a friend experienced in the cattle business, before he finally invested in the Longcrier cattle embryo program. One of the documents Walden read prior to investing, the "breeding and management agreement dated October 26, 1984," explained that Longcrier guaranteed a pregnancy but made no guarantee that any calf would be born.

Walden testified that he "was able to write off $100,000" on his 1984 tax return as a result of his investment with Longcrier. Walden testified that as of July 25, 1986, he had paid approximately $9,000 in interest on his promissory note and since

he was in the fifty-percent tax bracket, he had, as of July 25, 1986, received approximately $50,000 back from the U.S. government.

Thomas Gilbert, a certified public accountant, testified that his accounting firm prepared financial statements and year-end partnership returns for Longcrier from 1980 to 1982. In 1983 Longcrier had over a million-dollar profit. As of June 30, 1984, Longcrier's current liabilities were roughly twice their current assets.

Larry Dewayne Bierwinkle testified that he was an operations manager with Agrivest, an agriculture management investment consulting firm located in College Station, Texas. Bierwinkle testified regarding the documents and registration papers normally received by the purchaser/owner of a cattle embryo that develops and is subsequently born. Bierwinkle testified that in his opinion, the forty-five page "Longcrier Genetic Engineering Prospectus" projects: "overly optimistic market values" for the cattle produced; "very high" expectations for the percentage of quality cows produced; and a longer "average donor life" than the actual average. In Bierwinkle's opinion the prospectus omits the following relevant information: the total number of embryos to be transplanted; the negative aspects of embryo technology as far as dividing embryos; the competitive nature of the embryo transfer business; the undependability of the export market for cattle embryos; and the financial strength of the operator.

Bierwinkle then testified concerning plaintiff's exhibit 73, titled "individual inventory list," a document he assisted Agrivest in preparing. Agrivest was hired by Walden in January 1986 to travel to various places where Longcrier embryo progeny cattle were located in an attempt to trace any calves born from the cattle embryos purchased by Walden and estimate the calves' value. The cattle were then "inventoried" by Agrivest. Plaintiff's exhibit 73, the inventory, is a list containing thirteen columns. The columns are titled, from left to right, "owner," "breed," "calf #," "recip. #;"," "sire," "donor," "date due," "date born," "sex," "reported location," "current location," "status," and "score value." Walden is listed as the "owner" of each of the twenty-five calves or unborn fetuses entered on the inventory. The inventory shows that thirteen of Walden's cattle embryos were actually born and were located and identified by Agrivest. The inventory "score" reveals that a majority of Walden's calves, developed from cattle embryos he purchased, were of poor quality. The inventory also revealed that several of Walden's cattle embryos/fetuses had not been born as of February 10, 1986, the date on the inventory. Bierwinkle then testified that if Walden owned the calves reflected in the inventory, he would normally have certain papers and documents evidencing his ownership and, further, that even if Walden did own the calves, Walden might be precluded from taking possession of the calves due to liens and Longcrier's bankruptcy.

Ronald G. Kippin, a partner in Southwest Strategies, (Southwest) testified that Southwest engages in financial tax and investment planning. He testified that he evaluated the Longcrier 1984 embryo investment program and that several of Southwest's clients invested in the program. Kippin testified that Longcrier represented to him that the "size of the program would under no circumstances exceed 10 million dollars in sales" and that in fact the "program came up at 16.8 million dollars." The effect of increasing the program size was to raise the level of cattle embryo sales Longcrier needed to make to meet the forecast in the prospectus from 22.5 million dollars in annual embryo sales to 40 million dollars annual embryo sales. Kippin testified that had he known of the above "misrepresentation," he would have had "serious reservations concerning Longcrier's ability to generate that size of sales." Kippin further testified that based on his interpretation of the Longcrier prospectus, all the embryo developments and sales would take place at Longcrier Farms in Mineola, Texas. Kippin was unaware that liens would be placed by third-party contractors against the investment property of the investors. Kippin understood

that the only lien on the cattle would be that of Sabine, to secure each investor's promissory note. Kippin testified that each investor was informed that he would have good title to his embryos or pregnancies, and that the donor cattle were below the quality represented by Longcrier. Kippin also testified that the owners/investors did not in fact have an opportunity to manage the investments as the prospectus indicated. Kippin testified that Walden was not one of the investors Southwest put in the Longcrier embryo program. Kippin testified that between May and June of 1984 Longcrier flew him to its farm where he toured the facility and observed barns, veterinarians, cattle, a cattle embryo under a microscope, and the equipment necessary for production and implantation of cattle embryos. Kippin testified that he had monitored the 1984 Longcrier embryo investment program and determined that embryos were actually produced.

Pertinent portions of the deposition of Harvey McLean, Chairman of the Board of Paris Savings and Loan, were then read into the record. McLean's deposition reflects that Paris had some prior business dealings with Longcrier. McLean testified that he had visited the Longcrier farm in Mineola to discuss business concerning a different investment.

### The Second Transaction

The second transaction, between Paris and Sabine, occurred in November 1984. Paris made a loan to Sabine, and Sabine, as security for the loan, transferred Walden's note and letter of credit to Paris. Walden testified that at the time of his initial investment with Longcrier he had never heard of Paris Savings & Loan Association. Walden testified that Paris had nothing to do with his original investment.

Scott Bickford, a loan officer for Paris, testified that Paris currently owned Walden's note and letter of credit. Bickford testified that the note and letter of credit were assigned to Paris at "closing" of the loan from Paris to Sabine. Bickford testified that H.L. Longcrier III (Hank) was to guarantee the loan from Paris to Sabine, but, by mistake, H.L. Longcrier II (Les) was approved as the guarantor by Paris' Board of Directors. Paris did not obtain financial statements on Sabine prior to making the loan to Sabine. However, Paris did obtain financial information on Longcrier Farms, Hank Longcrier and Les Longcrier. Bickford testified that at the time Paris made the loan to Sabine he was aware that the notes and letters of credit were obtained by Sabine and Longcrier from investors seeking a "tax deal" involving an embryo transplant program. Bickford testified that he and an attorney for Paris both reviewed each of the letters of credit Paris accepted from Sabine prior to closing the loan with Sabine. Bickford identified other documents contained in Paris' "file" on the loan to Sabine.

Dennis Charles McCuistion, a banking and finance expert called by Walden, basically testified concerning the proper way for a bank or savings and loan association to make a loan. McCuistion testified that he had not read any of the depositions taken in discovery for trial on the merits of this case, that the opinions he gave in the temporary injunction hearing were based on his experience and the testimony he had heard at the hearing so far. McCuistion testified that he did not know exactly what documents Paris relied on in making the loan to Sabine. McCustion testified that, in his opinion, Paris "didn't have the foggiest notion" of how the money it loaned to Sabine was to be used. McCuistion testified that in his opinion it was not "prudent" for Paris to make the loan to Sabine without investigating how Sabine intended to use the loan proceeds as working capital. McCuistion also testified that Sabine's proposed method of repayment of the loan to Paris "seemed strange" to him and "violated prudent lending procedures." McCuistion testified that the fact that ownership of Sabine was transferred from Les Longcrier to Owen Bird approximately one week before Paris and Sabine "closed" their loan, should have been a "red flag" to Paris that there were at least "documentation problems" with the loan. McCuistion testified that in his opinion Paris "should have" followed certain procedures and that

by failing to follow these procedures Paris also failed to follow "prudent lending practices." McCuistion testified that Paris "totally disregarded" the underlying transaction between Sabine, Longcrier, and the investors. McCuistion testified that in his opinion some of the procedures followed by Paris in making the loan to Sabine *did* conform with "prudent lending practices."

Mark Rodgers, an officer of Paris, testified that Walden defaulted on his promissory note and after discussing the situation with Phil Conway, he prepared the documents necessary to draw upon Fox and Jacobs under Walden's letter of credit and had the documents transmitted to Fox and Jacobs.

Scott Bickford was recalled, and testified regarding Paris' loan to Sabine. Bickford testified concerning what documents Paris reviewed in making the loan, the identity of Paris' employees with whom he consulted about the requested loan, and the information he presented to Paris' "loan committee." Bickford testified that on the date of the loan from Paris to Sabine, neither he nor anyone else at Paris, as far as he knew, had knowledge of any fraudulent misrepresentations made by Sabine or Longcrier to Walden.

Philip Conway, the current Senior Vice President and Manager of Commercial Loans for Paris, testified regarding the procedures followed by Paris in making the loan to Sabine. Conway was not employed with Paris when the loan to Sabine occurred. Conway testified basically that in his opinion Paris' loan to Sabine followed "prudent lending practices."

■ Clearly, the facts surrounding each transaction in the case at bar are not so egregious as to rise to the level of "fraud in the transaction" as contemplated by section 5.114(b). The evidence is undisputed that Longcrier had the necessary facilities to produce and actually did produce cattle embryos. In fact, the evidence is undisputed that thirteen of Walden's twenty-five embryos had actually been born prior to the hearing on the temporary injunction. The facts before us are not comparable to the facts in *Sztejn, United Bank,* or *Phi-*

*lipp Brothers* where the beneficiary shipped totally worthless material. In the present case, it is true that the calves born from the embryos were below the quality Walden and Longcrier had hoped for. Nonetheless, cattle were produced.

Furthermore, there is no evidence that Longcrier *intended* that the cattle produced from the embryos be low-quality calves. In *Sztejn,* *United Bank,* and *Philipp Brothers,* the beneficiary under the letter of credit *knew* he was shipping worthless goods; the beneficiary *intended* to ship worthless goods and nevertheless collect on the letter of credit. The present case involves an *investment.* Walden knew from the beginning, and in fact the brochures and prospectus Longcrier distributed stated, that Longcrier did not guarantee a birth.

Likewise, this is not a situation like *Sztejn, United Bank,* or *Philipp Brothers,* where the customer was "denied any value from his participation in the underlying contract." *See GATX,* 657 S.W.2d at 183. Walden received a tax benefit as a result of his investment in Longcrier's embryo program. There is simply no evidence in the record of "fraud in the transaction" between Sabine, Walden, and Longcrier of the magnitude necessary to justify an injunction under section 5.114(b). In the present case, for purposes of a section 5.114(b)(2) injunction, any fraudulent wrongdoing by Sabine did not so vitiate the entire transaction that the legitimate purposes served by the independence of the issuer's obligation were undermined.

■ There is also no evidence of 5.114(b) "fraud in the transaction" between Sabine and Paris. Again, although Walden may have causes of action against Paris in his underlying suit, there is no evidence that Paris engaged in or knew of intentional and egregious conduct constituting "fraud in the transaction." Simply failing to follow "prudent lending practices" does not constitute "fraud in the transaction." Additionally, Paris' "total disregard" for the "underlying transaction" does not constitute "fraud in the transaction" in the present case. Paris was not a party to the

original transaction between Walden, Sabine, and Longcrier. Paris merely accepted letters of credit as collateral for a loan. Comment One to section 5.114 of the Texas Business and Commerce Code states, in pertinent part, that "[t]he letter of credit is essentially a contract between the issuer and the beneficiary and is recognized by this Article as *independent of the underlying contract* between the customer and the beneficiary" (emphasis added). Appellants have cited no authority supporting their contention that Paris was under a duty to investigate the underlying transaction. Under the facts of the case at bar, if Paris did in fact "totally disregard the underlying transaction," such disregard does not rise to the level of "egregious, intentional, and unscrupulous fraud" constituting "fraud in the transaction" under section 5.114(b).

In *Sztejn*, *United Bank*, and *Philipp Brothers*, there was "egregious" and "intentional" "fraud in the transaction" to such a degree that the legitimate purposes of the letter of credit were subverted so that the letter of credit was being used as a vehicle for fraud. Section 5.114(b) allows a "court of appropriate jurisdiction" to enjoin payment under the letter of credit in these egregious, intentionally fraudulent "fraud in the transaction" fact patterns. We have extensively and very carefully examined the record in the present case, and we find that the record contains no evidence of fraud in either transaction that rises to the egregious, intentional, and unscrupulous level of fraud necessary to trigger applicability of section 5.114(b). For purposes of a section 5.114(b)(2) injunction, any wrongdoing by Paris did not so vitiate the entire transaction that the legitimate purposes served by the independence of the issuer's obligation were undermined.

We do *not* hold that there is no actionable fraud in either transaction. We hold only that there is no "fraud in the transaction" of the type required to fall within section 5.114(b). Whatever actionable fraud there may have been, however, can be determined only after a trial on the merits; such fraud does not justify a temporary injunction. Therefore, the trial

court abused its discretion in granting a temporary injunction based upon a finding of "fraud in the transaction" under section 5.114(b).

The temporary injunction granted by the trial court states, in pertinent part:

From the foregoing facts, the Court concluded that there was a showing of probable right to injunctive relief in that there was evidence of fraud in the transaction and of improper presentment. The Court further concluded that Plaintiff RON WALDEN would suffer irreparable injury for which he had no adequate remedy at law if injunctive relief were not granted,....

We have meticulously reviewed the record, and we hold that there is no evidence of "fraud in the transaction" as required by section 5.114(b).

■ For the following reasons, the remaining conclusions of the trial court, that there was evidence of improper presentment and that Walden would suffer irreparable injury for which he had no adequate remedy at law, are not grounds for enjoining the honor of the letter of credit in the present case. As we have previously stated, there are only three situations in which a court may enjoin payment under a letter of credit. Those three situations are set forth in section 5.114(b): (1) when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform; or (2) when documents appear on their face to comply with the terms of a credit but a required document is in fact forged; or (3) when there is fraud in the transaction. *See* TEX.BUS. & COM.CODE ANN. § 5.114(b) (Tex.U.C.C.) (Vernon Supp.1986). If all of the above three situations are inapplicable, the general rule stated in section 5.114(a) is controlling and an injunction is not available. Courts may not subvert the general rule and enjoin honor of a credit unless one of the three limited situations set forth in section 5.114(b) is present. The trial court's conclusion that there was improper presentment by Paris does not warrant an injunction since improper presentment is not one of the situations described in sec-

tion 5.114(b). Furthermore, allowing an injunction to issue based on improper presentment would be illogical because one improper presentment does not preclude Paris from curing the defect and presenting again. *See Siderius*, 583 S.W.2d at 862 (if, after initial presentment and dishonor, beneficiary of credit could cure defects and timely present again, issuer waives such defects as grounds for subsequent dishonor unless beneficiary is made aware of the defects so that he does have an opportunity to cure and present again). Likewise, the trial court's conclusion that Walden would suffer irreparable injury and have an inadequate remedy at law is not, in the absence of "fraud in the transaction" as required by section 5.114(b), sufficient to justify enjoining honor of a letter of credit. *Cf. GATX*, 657 S.W.2d at 180–81 (court may enjoin honor if the requisites of section 5.114(b) are met *and* common-law requirements for injunctive relief are satisfied.) Therefore, we hold that the trial court abused its discretion in granting an injunction based on "fraud in the transaction."

Since Paris' second point of error is dispositive of the appeal before us, we will not address Paris' remaining points of error. The judgment of the trial court is reversed, and the temporary injunction is dissolved.