OPINION
Defendants-appellants, PTZ Trading, Ltd. ("PTZ"), Barclays Bank ("Barclays"), and First National Bank of Chicago ("First National"), appeal the decision of the Clermont County Court of Common Pleas granting a permanent injunction against them on behalf of plaintiffs-appellees, Mid-America Tire, Inc. ("MAT") and Jenco Marketing, Inc. ("Jenco").
This controversy arises out of extensive negotiations for the purchase of Michelin tires by MAT and Jenco from PTZ, financed by a letter of credit ("L/C") issued through First National, payable at Barclays. The injunction prevents PTZ from collecting on the L/C.
A L/C is a commercial document which entitles its beneficiary to collect payment upon presentation of documents required by and strictly conforming to the terms of the L/C. The L/C is opened by an applicant (MAT) at an issuing bank (First National) which is ultimately responsible for paying the L/C. When the beneficiary (PTZ) presents documents strictly conforming to the L/C's terms, the issuing bank must honor the documents and pay the L/C. Where the L/C so provides, these documents are presented at an advising bank (Barclays) which demands payment from the issuing bank. See White and Summers, Uniform Commercial Code (4th Ed. 1995) Vol. 3, 104-108, Section 26-1.
The non-bank parties in this action are tire brokers with extensive experience in purchasing and selling tires. The transaction began in October 1998 when Gary Corby, a broker in Wales, United Kingdom, called John Evans, a broker in England who occasionally acted as a PTZ agent. Corby asked Evans about information that Michelin was making surplus and cosmetically blemished ("blem") mud and snow ("MS") tires available from its factory in France.
Evans called Aloysius Sievers, a broker in Germany who also acted as an occasional PTZ agent. PTZ is a brokering company set up in Guernsey Island, Channel Islands, United Kingdom. Sievers called Patrick Doumerc, sales manager of Doumerc SA, a tire wholesale and distribution company in France which is the sole authorized distributor of Michelin blem tires.
Doumerc confirmed that he had MS tires, and he offered to sell them to Sievers. Sievers conveyed this information to Evans, agreeing to sell the tires to PTZ, as PTZ owed Sievers money. Evans called Corby, offering to sell the tires on behalf of PTZ.
Corby called Paul Chappell, a broker in California, asking if Chappell wanted the tires. Chappell had an interest, but he passed the deal to A.F. Jenkins, a broker in Tennessee and owner of Jenco. Jenkins was interested. Jenkins authorized Chappell to act on Jenco's behalf, with Jenkins and Chappell copying correspondence to one another. Jenkins spoke with Arthur Hein, owner of MAT, about MAT financing the purchase of MS tires for Jenco. MAT is an Ohio corporation located in Clermont County, Ohio.
Over the following four months, negotiations proceeded for the tire purchase. At the start of the negotiations, Chappell and Jenkins inquired of Corby whether he could procure summer tires as well as MS tires. Corby responded that his source could provide such tires. Numerous tire lists were given by Corby to Chappell and Jenkins, first for MS tires and later for summer tires. These lists included the tire designation "DA/2C," a designation that Chappell and Jenkins were unfamiliar with. Corby informed them that the tires were in a different warehouse in France. In fact, the tires did not have United States Department of Transportation identification numbers, making them illegal to sell in the United States.
Throughout negotiations, Corby made statements indicting that he was, in fact, working with his source in brokering the tire sale. He made specific representations that there would be fifty to seventy thousand tires available every three months at a price 40 percent to 60 percent below United States market price. He also stated that his source was the exclusive direct Michelin dealer for European blem and surplus tires.
The negotiations resulted in a proposed deal for the MS summer tires. PTZ would deliver to Chappell and Jenkins a pro forma invoice setting forth the available tire quantities and offered price. Chappell and Jenkins would then open a L/C on behalf of PTZ, Corby's source, for the MS tires, per the pro forma invoice. PTZ would then ship the tires to Chappell and Jenkins. In November and December 1998, Corby pressured Chappell and Jenkins to open the L/C, asserting that if they did not do so the deal would be ended, thus preventing Chappell and Jenkins from being able to procure the requested summer tires.
In late December 1998, Jenkins began having reservations regarding the deal because Corby's representations were becoming suspicious. Jenkins requested to speak to Corby's source, and Evans then began a correspondence with Jenkins. In early January 1999, Evans sent to Jenkins faxes that provided Jenkins assurances regarding the exclusive nature of the deal and the large quantity of tires available. With these assurances, Jenkins had Hein open a L/C in late January 1999.
Hein applied for the L/C through First National. The L/C was irrevocable; it could be revoked only with the consent of both MAT and PTZ. It was to expire on March 18, 1999. The L/C allowed a variety of shipping methods, per conversations between Chappell, Corby, and Evans. Permission to ship and inspection of the tires were not made conditions of the L/C.
During this time and into February 1999, Chappell and Jenkins were still attempting to procure the summer tires. But the lists they were receiving from PTZ through Corby did not include the promised quantities. The prices offered by PTZ were far higher than promised, in some cases being equal to or above the United States market price. Chappell and Jenkins' concerns with these lists continued to grow as mid-February approached because it was appearing that they were not being offered the deal promised. Among other things, the lists they were receiving included a great number of tires they could not market in the United States because they were designed for European vehicles. They were being told at this time that PTZ was negotiating to purchase tires from Michelin, even though they had earlier been promised that the summer tires would already be available.
In early March 1999, Chappell and Jenkins began discovering the untrue nature of Corby's representations. They found out from another tire broker the truth about the DA/2C designated tires. They also discovered that PTZ was negotiating with Doumerc, who was the sole distributor of Michelin surplus tires. When Chappell and Jenkins confronted Evans with this information, Evans admitted to the truth, and new shipping arrangements for the MS tires were made. Chappell and Jenkins also spoke with Sievers, who agreed to the alternate shipping arrangements.
Just before the L/C expired on March 18, 1999, Sievers called Jenkins to inform him that he was shipping the MS tires. Jenkins protested that he had not given permission to ship the tires. Sievers responded that he did not need permission and proceeded to make shipping arrangements himself. Jenkins threatened legal action.
MAT and Jenkins then filed the instant complaint, seeking an injunction to prevent honor and payment of the L/C. A temporary restraining order ("TRO") was entered on March 16, 1999.
The tires were shipped. Sievers and Evans took the required papers to Barclays Bank for presentment. Sievers presented commercial invoices signed by himself, packing slips, and the transporter shipping note. The documents referenced pro forma invoice 927-98, dated November 19, 1998. Sievers signed the documents for PTZ. Barclays was unaware of the TRO at the time of presentment.
When First National was notified by Barclays of the presentment, First National notified Barclays about the TRO. Sievers was then notified by Barclays that the L/C could not be paid. Around this time, the trial court extended the TRO into early April, pending a preliminary injunction hearing. A preliminary injunction was soon issued, effective until a permanent injunction hearing could be held. At this time, the shipping company billed Jenkins, but Jenkins refused to pay due to the ongoing legal proceedings. The MS tires remain in storage in Savannah, Georgia and Rotterdam, Denmark, their shipping destinations.
In early July 1999, Hein, Jenkins, Chappell, Evans and Sievers were each deposed and the deposition transcripts were filed in the trial court. On July 8, 1999, the trial court heard PTZ's motion to reconsider the preliminary injunction. The trial court reaffirmed its decision to issue the preliminary injunction.
On July 14, 1999, the trial court held a permanent injunction hearing. Hein, Jenkins, Chappell, Evans, and Sievers testified. On July 23, 1999, the trial court filed a decision granting the permanent injunction. On October 8, 1999, the trial court filed findings of fact and conclusions of law. The trial court interpreted R.C. 1305.08 (UCC 5-112, "fraud and forgery") to allow an injunction to be issued against a L/C on the basis of a fraud in the underlying contract. The trial court found that the documents Sievers presented to Barclays strictly complied with the terms of the letter of credit as required by R.C. 1305.07.
The trial court found that Corby had made material misrepresentations to Chappell and Jenkins, and that Corby was acting as a PTZ agent when making these misrepresentations. The trial court further found that Evans and Sievers knew of and affirmed these misrepresentations. The trial court also found that Evans and Sievers affirmatively concealed that the DA/2C tires could not be sold in the United States. PTZ appeals.
PTZ's Assignment of Error No. 3:
 THE TRIAL COURT ERRED IN ENJOINING ENFORCEMENT OF AN INTERNATIONAL DOCUMENTARY LETTER OF CREDIT BASED ON AN ALLEGED FRAUD IN THE UNDERLYING COMMERCIAL TRANSACTION.
PTZ's Assignment of Error No. 5:
 MAT HAS AN ADEQUATE REMEDY AT LAW; THEREFORE, INJUNCTIVE RELIEF WAS IMPROPER.
MAT and Jenkins' Assignment of Error:[1]
 THE TRIAL COURT APPROPRIATELY ENJOINED PAYMENT OF THE LETTER OF CREDIT BECAUSE THE DOCUMENTS PRESENTED BY THE BENEFICIARY TO DEMAND PAYMENT ON THE LETTER OF CREDIT DO NOT CONFORM TO THE REQUIREMENTS OF THE LETTER OF CREDIT AND ARE INCONSISTENT WITH IT ON THEIR FACE.
PTZ contends that the trial court erred by granting the permanent injunction because there was not fraud justifying equitable relief. PTZ argues that a permanent injunction was unnecessary because MAT had an adequate remedy at law for monetary damages. MAT and Jenkins contend that the documents presented to collect on the L/C did not strictly conform to the L/C's terms.
Injunctive relief is an equitable remedy which lies only where there is not an adequate remedy at law. Haig v. Ohio State Bd. of Edn. (1992),62 Ohio St.3d 507, 510. A trial court's decision to grant or deny an injunction is a matter solely within that court's discretion. DanisClarko Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist. (1995),73 Ohio St.3d 590, paragraph three of the syllabus. "Abuse of discretion" connotes that the trial court's judgment was unreasonable, arbitrary, or unconscionable. An abuse of discretion will be found where the trial court's decision is without a reasonable basis or is not supported by competent, credible evidence. Middendorf v. Middendorf
(1998), 82 Ohio St.3d 397, 401.
We first begin with the basic principles underlying L/Cs:
 A simple letter of credit involves three parties: the buyer (called the "account party" or "applicant"), the buyer's bank that issues the letter of credit (the "issuing bank"), and the seller of the goods to be paid for (in the form of "draws") under the letter of credit. Letters of credit developed under the law merchant to facilitate payment in sales transactions. They are a useful commercial device because they provide an efficient way to substitute a credit-worthy party (normally a bank) for the buyer. This efficiency arises from the simplicity of the transaction; the seller gets paid once it presents the required documents to the issuing bank. To succeed, three different agreements are required: an underlying agreement for the sale of goods between the buyer (applicant) and the seller (beneficiary), an agreement for the creation of the credit between the buyer (applicant) and the bank, and the letter of credit, which is an irrevocable promise by the bank to pay the seller (beneficiary) on the presentation of certain documents.
 Nassar v. Florida Fleet Sales Inc. (S.D.N.Y. 1999), 79 F. Supp.2d 284,291, citing Alaska Textile Co. v. Chase Manhattan Bank, N.A., (C.A.2 1992), 982 F.2d 813, 815.
A L/C functions as a separate transaction from the underlying contract,[2] being comprised of a set of obligations different from those making up the underlying contract. The L/C provides a means to better guarantee that the seller receives payment and the buyer receives goods. Oftentimes in international transactions, the seller will not ship the goods unless there is payment, but the buyer will not pay unless goods are received. The L/C creates a compromise, by which the seller presents specified documents to the bank for payment, but these documents must demonstrate that goods have been shipped per the underlying contract. See 3 White and Summers, Uniform Commercial Code (4th Ed. 1995), 104-108, Section 26-1.
The L/C's separation from the underlying contract is referred to as the "independence principle".[3] The underlying contract is governed by common law principles or statutes such as specific articles of the Uniform Commercial Code ("UCC").[4] The L/C is governed by a different set of obligations provided by statutes such as UCC Article 5[5] and/or the Uniform Customs and Practice for Documentary Credits (1993 Revision)(UCP-500)("UCP").[6] The separateness of the L/C from the underlying contract ensures payment through a bank with the security of knowing that the bank — and therefore the L/C — is not subject to any (non)performance of the underlying contract. As noted by the Ohio Supreme Court:
 The "independence principle" requires a bank issuing a standby letter of credit[7] to honor any draw by the beneficiary that conforms to the express terms of the letter. The great utility of the letter of credit derives from the fact that the relationships between the customer, the bank, and the beneficiary are utterly independent of one another.
 State ex rel. Barclays Bank PLC v. Hamilton Cty. Court of Common Pleas
(1996), 74 Ohio St.3d 536, 541. For example, if the buyer refuses to perform, the seller can still collect payment for its performance on the contract. Or, if the seller refuses to perform or commits fraud, the buyer has a ready-made damages claim.
Under certain circumstances, honor and payment of a L/C may be enjoined by the courts, a situation presenting a "fraud exception." In Ohio, such court authority is governed by R.C. 1305.08:[8]
 (B) If an applicant claims that a required document is forged or materially fraudulent or that honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant, a court of competent jurisdiction may temporarily or permanently enjoin the issuer from honoring a presentation or grant similar relief against the issuer or other persons only if the court finds that:
 (1) The relief is not prohibited under the law applicable to an accepted draft or deferred obligation incurred by the issuer;
 (2) A beneficiary, issuer, or nominated person who may be adversely affected is adequately protected against loss that it may suffer because the relief is granted;
 (3) All of the conditions to entitle a person to the relief under the law of this state have been met; and
 (4) On the basis of the information submitted to the court, the applicant is more likely than not to succeed under its claim of forgery or material fraud and the person demanding honor does not qualify for protection under division (A)(1) of this section.
The trial court made its decision to issue the instant permanent injunction on the basis that R.C. 1305.08(B) allows an injunction to issue where there is fraud in the transaction, even if that fraud concerns only the underlying contract, not the L/C.
To understand the importance of the trial court's interpretation of R.C. 1305.08(B), one must note the controversy underlying the "fraud exception." Under former R.C. 1305.13, which tracked the language of former UCC 5-114, an issuing bank could refuse to honor a letter of credit or a court could enjoin payment of the letter of credit where there was a "fraud in the transaction." Substantial disagreement existed in the courts and between commentators regarding whether "fraud in the transaction" referred to the underlying contract or the separate transaction of presentment of documents for honor of the L/C. See 3 White Summers, Uniform Commercial Code (4 Ed. 1995), Section 26-10, and 2 Quinn, Quinn's Uniform Commercial Code Commentary and Law Digest (2 Ed. 1991 and Supp. 2000), Section 5-114[A][11]-[A][14] and [B][8]-[9].
At first glance, it might seem that this court need only determine the effect of the revision of court powers granted under former R.C. 1305.13
and current R.C. 1305.08. Namely, how should "material fraud" in R.C.1305.08(B) be interpreted, and does it have the same effect as "fraud in the transaction" under the former law? The applicability of the "fraud exception" in Ohio with regard to a fraud in the underlying contract has yet to be addressed.[9] Before determining if this issue need be considered, we must first determine what law applies to the instant L/C and the effect of any fraud exception under that law.
The general rule of R.C. Chapter 1305's applicability is included in R.C. 1305.02(A):
 This chapter applies to letters of credit and to certain rights and obligations arising out of transactions involving letters of credit.
In accordance with the UCC, the Revised Code allows the parties to vary the L/C's terms and to choose other law to govern the L/C. R.C. 1301.02(C) provides:
 (C) The effect of the provisions of Chapters 1301., 1302., 1303., 1304., 1305., 1307., 1308., 1309., and 1310. of the Revised Code may be varied by agreement, except as otherwise provided in those chapters and except that the obligations of good faith, diligence, reasonableness, and care prescribed by those chapters may not be disclaimed by agreement, but the parties by agreement may determine the standards by which the performance of those obligations is to be measured if the standards are not manifestly unreasonable.
In general, territorial application and choice of law is governed by R.C. 1301.05(B):
 (B) Where one of the following provisions of Chapters 1301., 1302., 1303., 1304., 1305., 1307., 1308., 1309., and 1310. of the Revised Code specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law, including the conflict of laws rules, so specified:
* * *
 (4) Choice of law as to letters of credit under section 1305.15 of the Revised Code[.]
Under R.C. 1305.15(A), the parties may choose what law and jurisdiction will control the L/C. Once so chosen, any conflict between the chosen law and the Revised Code is resolved in favor of the chosen law. R.C.1305.15(C).[10]
In Mantua Mfg. Co. v. Commerce Exchange Bank (1996), 75 Ohio St.3d 1, the Ohio Supreme Court addressed the ability of the parties to make the UCP the law that governs a L/C. The court noted:
 Parties to a letter of credit may, however, choose to vary the effects of the provisions of R.C. Chapter 1305, "except as otherwise provided (in that chapter) and except that the obligations of good faith, diligence, reasonableness, and care prescribed by (that chapter) may not be disclaimed by agreement." R.C. 1301.02(C).
 Id. at 5. The court went on to hold:
 When a letter of credit states that it is subject to the [UCP] and there is a direct conflict between a provision of the UCP and an analogous provision of R.C. Chapter 1305, the UCP terms replace those of R.C. Chapter 1305, unless that replacement violates the conditions of R.C. 1301.02(C).
 Id. at paragraph one of the syllabus.
In Mantua Mfg., Commerce Exchange Bank issued a L/C allowing a party to draw against the L/C upon presentment of specified documents. The L/C stated that it "was `subject to the [1983 revision of the UCP].'" Id. at 2. The Supreme Court found that the L/C was specifically governed by the UCP, not the Revised Code. Id. at 5.
Thus, when an applicant opens a L/C, that applicant may alter the terms of the L/C to differ from the Revised Code or to make law other than the Revised Code (usually the UCP) applicable to the L/C. Pursuant to R.C.1301.02(C), though, the parties may not waive or alter "the obligations of good faith, diligence, reasonableness, and care prescribed by [R.C. Chapter 1305.]" The parties can only prescribe how performance of those obligations is to be measured.
The L/C terms that may not be varied by agreement are included in R.C. 1305.02(C):
 With the exception of this division, divisions (A) and (D) of this section, divisions (A)(9) and (10) of section 1305.01, division (D) of section 1305.05, and division (D) of section 1305.13, and except to the extent prohibited in division (C) of section 1301.02
and division (D) of section 1305.16 of the Revised Code, the effect of this chapter may be varied by agreement or by a provision stated or incorporated by reference in an undertaking. A term in an agreement or undertaking generally excusing liability or generally limiting remedies for failure to perform obligations is not sufficient to vary obligations prescribed by this chapter.
The specified, unalterable terms concern: the general applicability of R.C. Chapter 1305 and its adoption of the independence principle, R.C.1305.02(A) and (D); the definitions of "issuer" and "letter of credit," R.C. 1305.01(A)(9) and (10); the default expiration date of a L/C, R.C.1305.05(D); the right of an issuer to object to an assignment of the L/C proceeds by the beneficiary, R.C. 1305.12(D); and subrogation rights under an L/C, R.C. 1305.16(D).
R.C. Chapter 1305 imposes obligations on the issuing bank to honor the L/C unless the presented documents, on their face, do not conform to the terms of the L/C, and prescribes the time and manner in which the issuing bank must act upon the presentment. R.C. 1305.07 and 1305.08(A). The Revised Code commands that the beneficiary make warranties with regard to an honored presentation, R.C. 1305.09, and provides remedies for wrongful dishonor by the issuing bank and for a bank's failure to meet its obligations. R.C. 1305.10. The Revised Code further governs the beneficiary's ability to transfer the L/C or assign its proceeds, R.C.1305.12 and 1305.13, and sets forth subrogation rights under the L/C. R.C. 1305.16. No obligations of "good faith, diligence, reasonableness, and care" are created by R.C. Chapter 1305 as between the applicant and beneficiary in relation to the underlying contract.[11]
The instant L/C states that it is governed by the UCP:
 The credit is subject to the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication 500. This telex is the operative instrument in accordance with Article 11(A) Publication 500.
Thus, we must determine the effect of the UCP upon the instant case.
UCP, Article 3 provides:
 (a) Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the Credit. Consequently, the undertaking of a bank to pay, accept and pay Draft(s) or negotiate and/or to fulfil any other obligation under the Credit, is not subject to claims or defences [sic] by the Applicant resulting from his relationships with the Issuing Bank or the Beneficiary.
Article 4 of the UCP states:
 In Credit operations all parties concerned deal with documents, and not with goods, services and/or other performances to which the documents may relate.
 Articles 3 and 4 embody the "independence principle." The independence principle has been explained:
 The fundamental principle governing documentary letters of credit and the characteristic which gives them their international commercial utility and efficacy is that the obligation of the issuing bank to [honor] a draft on a credit when it is accompanied by documents which appear on their face to be in accordance with the terms and conditions of the credit is independent of the performance of the underlying contract for which the credit was issued. This independence principle infuses the credit transaction with the simplicity and certainty that are its hallmarks. The letter of credit takes on a life of its own as manifested by the fact that in credit operations all parties concerned deal in documents, not in goods, services, and/or other performances to which the documents may relate.
 This independence principle is embodied in the UCP. See UCP Article 3, 4. The principle generally persists even where there is fraud in the underlying transaction. See UCP Article 16(a).
 Nassar, 79 F. Supp.2d at 291, citing Alaska Textile,982 F.2d at 815-816, and Semetex Corp. v. UBAF Arab American Bank (S.D.N.Y. 1994),853 F. Supp. 759, 770, affirmed (C.A.2 1995), 51 F.3d 13. The Alabama Supreme Court extensively addressed the general inapplicability of an exception regarding fraud in the underlying contract, as embodied in Section 7-5-114(2), Ala. Code 1975,[12] to L/Cs governed by the UCP and the reasons why such a fraud exception is not applicable:
 Section 7-5-114(2), Ala. Code 1975, authorizes courts to issue injunctions that will prevent the issuer in a letter of credit transaction from honoring drafts or demands for payment where there has been a fraud in the issuance of the letter or a fraud in the underlying transaction. Section 7-5-102(4), however, specifically states that Article 5, including § 7-5-114(2), is inapplicable when letters of credit are subject to the UCP. The parties stipulated in the letter of credit that the UCP would govern any dispute that might arise in the credit transaction. This Court has stated:
 "The UCP, which governs this dispute, does not refer to a fraud exception to the payment obligations established in a letter of credit.["]
* * *
 A letter of credit is a financing engagement by an issuing bank, made at the request of an applicant (or customer), to honor demands for payment by the beneficiary of the credit, provided the terms and conditions of the letter of credit are met. Ordinarily, letters of credit promote the sale of commodities by enabling a buyer of goods to obtain financing while at the same time securing payment for those goods in favor of the seller.
* * *
 A letter-of-credit transaction typically includes three separate commitments: (1) the applicant's agreement with the bank, which obligates the bank to issue the letter and obligates the applicant to reimburse the bank; (2) the bank-beneficiary relationship, i.e., the letter of credit itself; and (3) the applicant-beneficiary relationship, i.e., the underlying contract. The letter-of-credit transaction is essentially an independent contract between the issuer * * * and the beneficiary [.] * * * In these transactions, the issuer must honor the drafts or other demands for payment upon compliance with the terms of the letter of credit, which exist independently from the underlying transaction.
* * *
 Parties that enter into a credit arrangement do so to avail themselves of the benefits of that arrangement. * * * It is important to understand the functions of letters of credit in order to fully understand the consequences the fraud exception has on this commercial device. * * * We recognize that, as a general rule, letters of credit cannot exist without independence from the underlying transaction. Thus, when courts begin "delving into the underlying contract, they are impeding the swift completion of the credit transaction." "The certainty of payment is the most important aspect of a letter of credit transaction, and this certainty encourages hesitant parties to enter into transactions, by providing them with a secure source of credit."
 The extensive use of the fraud exception may operate to transform the credit transaction into a surety contract. A standby credit is essentially equivalent to a loan made by the issuing bank to the applicant. Like a surety contract, the standby credit ensures against the applicant's nonperformance of an obligation. Unlike a surety contract, however, the beneficiary of the standby credit may receive its money first, regardless of pending litigation with the applicant. The applicant may then sue the beneficiary for breach of contract or breach of warranty, or may sue in tort, but without the money. Parties to standby credit transactions have bargained for a distinct and less expensive kind of credit transaction. Therefore, we resist the temptation that the fraud exception invites to "transform the quick, efficient payment mechanism of the standby credit into the protracted surety contract inquiry." (Citations and footnotes omitted.)
 Southern Energy Homes, Inc. v. AmSouth Bank of Alabama (Ala. 1998),709 So.2d 1180, 1184-1186.
In the normal case of fraud surrounding a L/C, the fraud might occur only in the underlying contract or only in the presentment of documents. Clearly, where the fraud is in the presentment of documents, the bank may dishonor the presentment where the documents are facially nonconforming. The courts may enjoin payment in such a circumstance as the attempted fraud involves the L/C itself. Xantech Corp. v. Ramco Industries, Inc.
(Ct.App.Ind. 1994), 643 N.E.2d 918, 920-921. See Shaffer v. BrooklynPark Gardens Apts. (1977), 311 Minn. 452, 250 N.W.2d 172. In line with this circumstance, courts have limited the issuance of injunctions against a L/C to only those situations in which the fraud is in the credit transaction. See All Seasons Indus. v. Tresfjord Boats A/S
(Ct.App.Ind. 1990), 563 N.E.2d 174, 177-178.
Courts have found one limited exception to the independence principle to permit an injunction preventing honor and payment of a L/C. That circumstance arises when the beneficiary undertakes a fraud so extensive as to "vitiate the entire transaction." In such a case, the beneficiary not only commits a fraud in the underlying contract, but the beneficiary carries that fraud so far as to impact the L/C itself. Thus, there exists not only fraud in the underlying contract, but more importantly, the fraud exists in the credit transaction, the L/C. See Roman CeramicsCorp. v. People's Natl. Bank (C.A.3 1983), 714 F.2d 1207.
This "vitiation exception"[13] is of a very limited nature because, where the fraud is only in the underlying contract, the general rule is maintained; the fraud may not serve as a basis to enjoin the letter of credit. As noted in the seminal case on the issue:
 It is well established that a letter of credit is independent of the primary contract of sale between the buyer and the seller. The issuing bank agrees to pay upon presentation of documents, not goods. This rule is necessary to preserve the efficiency of the letter of credit as an instrument for the financing of trade. One of the chief purposes of the letter of credit is to furnish the seller with a ready means of obtaining prompt payment for his merchandise. It would be a most unfortunate interference with business transactions if a bank before honoring drafts drawn upon it was obliged or even allowed to go behind the documents, at the request of the buyer and enter into controversies between the buyer and the seller regarding the quality of the merchandise shipped. If the buyer and the seller intended the bank to do this they could have so provided in the letter of credit itself, and in the absence of such a provision, the court will not demand or even permit the bank to delay paying drafts which are proper in form.
 Szetjn v. J. Henry Schroder Banking Corp. (1941), 177 Misc. 719, 721,31 N.Y.S.2d 631, 633-634. See, also, APV Baker, Inc. v. Harris Trust Savings Bank (W.D.Mich. 1991), 761 F. Supp. 1293.
Szetjn's general rule is overcome where the fraud is so extensive that it calls into question the L/C, but this "exception to the duty to honor * * * must be narrowly construed:"
 In light of the basic rule of the independence of the issuer's engagement and the importance of this rule to the effectuation of the purposes of the letter of credit, we think that the circumstances which will justify an injunction against honor must be narrowly limited to situations of fraud in which the wrongdoing of the beneficiary has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served. A court of equity has the limited duty of "guaranteeing that [the beneficiary] not be allowed to take unconscientious advantage of the situation and run off with plaintiff's money on a pro forma declaration which has absolutely no basis in fact."
Roman Ceramics Corp. v. People's Natl. Bank (C.A.3 1983), 714 F.2d 1207,1212 fn. 12, quoting Intraworld Industries, Inc. v. Girard Trust Bank
(1975), 461 Pa. 343, 359, 336 A.2d 316, 324-325.[14] In fact,Intraworld Industries goes on to hold:
 We conclude that, if the documents presented by [the beneficiary of the letter of credit] are genuine in the sense of having some basis in fact, an injunction must be refused. An injunction is proper only if [the beneficiary] * * * has no bona fide claim to payment under the [L/C].
Id. at 361, 336 A.2d at 325. In considering the policy underlying the vitiation exception, the Roman Ceramics court wrote:
 The Pennsylvania Supreme Court in Intraworld * * * carefully weighed the competing strengths of the policies implicated by letters of credit. On the one hand, the highest court of Pennsylvania has recognized the need for unfettered commercial transactions, which a letter of credit serves. On the other hand, that court has also recognized the importance of the statutory exception to the general rule of independent obligations, when active fraud (as distinct from mere breach of warranty) is practiced by the beneficiary of the letter of credit.
 714 F.2d at 1213-1214.
The court in Intraworld Industries affirmed the denial of an injunction because the plaintiff failed to show that the purported beneficiary had a "bona fide claim" against payment of the L/C. 461 Pa. at 362-364,336 A.2d at 326-327. Additionally, the court refused to impose upon the issuer an obligation to concern itself in or resolve "the dispute over the rights and obligations of the parties to the lease [underlying contract]," because the issuer's duties include only
 a careful scrutiny of the documents, but once it is determined that the documents conformed to the requirements of the credit, [the issuer] bore no responsibility for the performance of the [underlying] lease obligations or the genuineness of the documents. It would, we think, place an issuer in an intolerable position if the law compelled it to serve at its peril as an arbitrator of contract disputes between customer and beneficiary.
* * *
 The bank is not obliged to assume the burdens of a controversy between the beneficiary and customer and incur the responsibility of establishing as an excuse for not paying a draft that the customer's version is the correct one. (Citations omitted.)
 Id. at 364-365, 336 A.2d at 327. The above-quoted language recognizes that the L/C and the issuing bank should not be affected by or concerned with the terms of the underlying contract or obligations created by law relating to the underlying contract. If this were not the case, L/Cs would have no meaningful utility in commercial dealings.
In Roman Ceramics, there was a fraud taking place both in the underlying contract and in the presentment for honor of the L/C. The presenting party was attempting to be twice paid for the same transaction, and then attempting to immunize this conduct behind the independence principle. The court did not allow such dealings, affirming the district court's statement that the conduct "so vitiates the entire transaction that the legitimate purposes of the independence of [the] letter of credit with [the bank] are no longer served. Id. at 1215.
The circumstance of a vitiating fraud also took place in Szetjn, where the buyer purchased specific brush "bristles," but the seller shipped crates of "cowhair, other material and rubbish with intent to simulate genuine merchandise and defraud the [buyer]." The seller then presented for honor of the L/C documents showing that it shipped "the bristles called for by the letter of credit." 177 Misc. at 720,31 N.Y.S.2d at 632-633. The court found that an injunction was warranted in that case because there was an active fraud by the seller both as to the underlying contract and the L/C, and because the buyer had called the active fraud to the bank's attention before honor. Id. at 722,31 N YS.2d at 634-635.[15]
The vitiation exception makes sense not only in legal analysis, but also in the practical business world. The general application of the independence principle provides the parties the security they seek when opening and collecting upon the L/C. The parties secure financing through the fiscal responsibility of the issuing bank, while taking steps to guarantee their own performance of the underlying contract.
The vitiation exception, as applied in Szetjn and Roman Ceramics, acts as a means to prevent intentional and active fraud which would otherwise defeat the purposes of a L/C. The existence of this exception prevents a party undertaking a complete fraud at all levels of the deal and then hiding behind the L/C. The exception provides a remedy for the aggrieved party where the fraud is so extensive that there is no remedy at law that would protect or repair the aggrieved party's interests.
The limited nature of the vitiation exception prevents the parties from running to court at the first signs of alleged misconduct or non-performance in the underlying contract. Nor can the parties use a dispute over their positions in the underlying contract as an excuse to prevent the issuing bank from fulfilling its obligations. Where the dispute concerns performance or breach of the underlying contract, the parties cannot be allowed to bring the bank into court. Allowing such action would defeat the purpose and separate character of the L/C. Instead, the parties can only take action against one another for relief at law, leaving the banks to adhere to those obligations specifically imposed by statute.[16]
This interpretation of the independence principle and the vitiation exception comports with the UCP. Clearly, where the presented documents are facially fraudulent the UCP would require dishonor. As noted above, cases consistently hold that a fraud in the underlying contract is alone insufficient to enjoin honor and payment of a L/C. Of course, the express terms of UCP Articles 3 and 4 would seem to disapprove of any fraud exception — even as to presentment — unless facially fraudulent documents are involved. We need resolve this possible ambiguity only if there is evidence of a fraud in the presentment in the instant case.[17]
The trial court found a fraud to have occurred only in the underlying contract, but not in presentment of documents to
Barclays for honor of the L/C. Because the finding that the presented documents complied with the L/C would otherwise disprove a potentially vitiating fraud, we must consider whether the presented documents strictly conformed with the terms of the L/C.
The general standard for a bank's review of presented documents is included in UCP Article 13:
 Banks must examine all documents stipulated in the Credit with reasonable care, to ascertain whether or not they appear, on their face, to be in compliance with the terms and conditions of the Credit. Compliance of the stipulated documents on their face with the terms and conditions of the Credit, shall be determined by international standard banking practice as reflected in these Articles. Documents which appear on their face to be inconsistent with one another will be considered as not appearing on their face to be in compliance with the terms and conditions of the Credit.
 Documents not stipulated in the Credit will not be examined by banks. If they receive such documents, they shall return them to the presenter or pass them on without responsibility.
UCP Article 13 imposes a requirement of strict compliance. Similarly, Ohio imposes upon banks the obligation to assure that presented documents strictly comply with the terms and conditions of the L/C in R.C.1305.07(A):
 Except as otherwise provided in section 1305.08 of the Revised Code, an issuer shall honor a presentation that, as determined by the standard practice referred to in division (E) of this section appears on its face strictly to comply with the terms and conditions of the letter of credit. Except as otherwise provided in section 1305.12 of the Revised Code and, unless otherwise agreed with the applicant, an issuer shall dishonor a presentation that does not appear to so comply.
See Palmer v. Yarrington (1853), 1 Ohio St. 253, 260; Lennox Ind. v.Mid-American Bank and Trust Co. (1988), 49 Ohio App.3d 117, 119; MeadCorp. v. Farmers and Citizens Bank (C.P. 1967), 14 Ohio Misc. 163, 167; Uniform Commercial Code 5-108 (1995 Revision).
The standard of strict compliance is intimately tied to the independence principle:
 Given the focus on conforming documents rather than the substance of the underlying transaction, strict compliance is required with the terms of the credit. Strict compliance is the second principle of letter of credit law. As explained by the Second Circuit:
 Because the credit engagement is concerned only with documents, the terms and conditions of a letter of credit must be strictly adhered to. * * * There is no room for documents which are almost the same, or which will do just as well. This rule of strict compliance finds justification in the bank's role in the transaction being ministerial, and to require it to determine the substantiality of discrepancies would be inconsistent with its function. Issuers are likewise held to rigorous standards. If the documents do comply with the terms of the credit, the issuer's duty to pay is absolute, regardless of whether the buyer-account party complains that the goods are nonconforming. Issuers, moreover, must swiftly and carefully examine documents submitted for payment; and they are estopped from complaining about discrepancies they did not assert promptly.
 As a consequence of this principle, banks assume a duty of examining all documents with reasonable care to assure that they appear to be conforming on their face. See UCP Article 15. Because of the exacting nature of this standard, letters of credit, any amendments, and all instructions must be clear and unambiguous. See UCP Article 5.
Nassar, 284 F. Supp.2d at 292, citing Alaska Textile, 982 F.2d at 816.
The letter of credit required the following documents to be presented:
 1. Signed commercial invoice in one original and three copies.
2. Packing list in one original and two copies.
 3. Transporter shipping note (titled as such) consigned to Jenco Marketing evidencing shipment from any European location to any European location marked freight collect.
or
 Full set plus one non-negotiable copy clean on board thru bills of lading consigned to Mid America Tire, Inc., 5999 Meijer Dr., Milford, OH 45150 marked freight collect and notify Mid America Tire, Inc., address above.
Covering shipment of:
 14,851 Michelin tyres at USD 34.83 per tire in accordance with seller's proforma invoice 927-98 dated 11-19-98.
The trial court found that the presented documents strictly complied with the requirements of the letter of credit.
MAT and Jenco argue that the wrong pro forma invoice was presented, but the L/C did not require a pro forma invoice to be presented. The invoice is only referenced with respect to the transaction covered by the L/C. Instead, the L/C required only that specific documents be presented demonstrating that the MS tires were shipped in accordance with the pro forma invoice. Thus, the only issues were whether the shipment was in accordance with the pro forma invoice and whether the proper documents were presented.[18]
In the instant case, the tires were shipped according to the pro forma invoice that all parties were using. The original and the revised pro forma invoices involved in this case are identical except that the original invoice has an incorrect address for a party. The revised pro forma invoice, dated December 1, 1998, specifically states that it revises pro forma invoice 927-98, the original invoice dated November 19, 1998. Thus, Sievers and Evans presented the required commercial invoices as signed by Sievers, the required packing lists, and the required shipping note, all according to pro forma invoice 927-98 dated November 19, 1998, which was revised on December 1, 1998.
MAT and Jenco also claim that the quantity of tires shipped was different from the quantity listed in the pro forma invoice. However, the pro forma invoice was not the binding invoice. Furthermore, inspection of the MS tires was not made a condition of the L/C, and MAT and Jenco are essentially arguing that the goods have not or will not pass inspection. Even if such is true, that fact is irrelevant as to the honor of the L/C because inspection was not a condition of the L/C.
MAT and Jenkins also assert that the L/C cannot be honored because they did not give permission to PTZ to ship the MS tires. However, permission to ship was not a condition of the L/C. The only requirement of the L/C was that PTZ ship the tires before the L/C expired on March 18, 1999. PTZ did so, as evidenced by the shipping documents. Even if permission were required, correspondence from Chappell, as Jenkins' express agent, to Corby and PTZ informed PTZ that Jenkins was extending the L/C to allow for shipment. This correspondence proves that permission to ship was actually given, making MAT and Jenkins' claim unfounded.
MAT and Jenkins assert with regard to the presentment of documents by Sievers and Evans that such presentment was fraudulent because Sievers, who signed the documents, was not a PTZ agent or official. MAT and Jenkins' contention is disingenuous at best. In their claim of fraud in the underlying contract, they asserted that Sievers was a PTZ agent. But now, as to the presentation of the documents, they allege that Sievers was not a PTZ agent. If MAT and Jenco's allegations regarding the alleged fraud in the underlying contract are taken at face value, they constitute an admission that Sievers was PTZ's agent, negating the claim that Sievers presented fraudulently signed documents. The evidence demonstrates, and the trial court found, that Sievers was authorized to act for PTZ, and we disregard MAT and Jenkins' frivolous contention that the presented documents were fraudulently signed.
The evidence supports the trial court's conclusion that the documents presented by Sievers and Evans to Barclays for honor and payment of the L/C strictly conformed to the terms and conditions of the L/C. As such, there was no fraud in the presentment which would invalidate the L/C. Without a fraud in the L/C, MAT and Jenkins cannot prove a fraud so extensive as to vitiate the entire transaction.
The conclusion that MAT and Jenkins are not entitled to an injunction is further supported by the fact that there is an adequate remedy at law for any fraud in the underlying contract. PTZ shipped to MAT all tires covered by the instant L/C and the testimony from Jenkins and Chappell demonstrates that they have made arrangements to sell these tires once payment is made on the L/C. Any damages incurred by MAT and Jenkins are monetary in character and can be remedied without resort to equitable court action. Even with honor of the L/C, nothing prevents MAT and Jenkins from seeking to recover at law all damages resulting from the alleged fraud in the underlying contract.[19]
In sum, R.C. 1305.08(B) is not applicable to the instant case, and the trial court erred in using this statute as a basis for issuing the instant permanent injunction. Furthermore, MAT and Jenkins failed to prove either fraud in PTZ's presentment of documents for honor or fraud of such character as to vitiate the transaction as whole. Thus, they failed to prove fraud which would justify dishonor of the presented documents or the granting of equitable relief. The presented documents strictly complied with the L/C's terms, entitling PTZ to payment of the L/C.
The trial court abused its discretion in issuing the permanent injunction preventing First National from honoring and paying the instant L/C. PTZ's third and fifth assignments of error are sustained, and MAT and Jenkins' cross-assignment of error is overruled.
PTZ's Assignment of Error No. 1:
 THE TRIAL COURT FINDINGS OF FACT ARE TOTALLY UNSUPPORTED BY THE RECORD AND IN FACT CONTRADICTED BY IT.
PTZ's Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN FINDING THAT THERE WAS ANY AGENCY RELATIONSHIP BETWEEN CORBY AND PTZ.
PTZ's Assignment of Error No. 4:
 THE TRIAL COURT ERRED IN FINDING THAT ANY CONDUCT CREATED A JUSTICIABLE CLAIM OF FRAUD.
PTZ contends that the trial court's findings of agency and fraud in the underlying contract are either not supported by or contradicted by the record. In light of our disposition of PTZ's third and fifth assignments of error and MAT and Jenkins' assignment of error, the trial court should not have even inquired into the issues of agency and fraud in the underlying contract. Without there first being proof of a fraud regarding the L/C itself, any fraud in the underlying contract cannot be the foundation for an injunction. Because the trial court should not have taken evidence on the issues of agency and fraud in the underlying contract, the trial court's findings on these matters are vacated. The assignments of error are sustained.
Although not raised by the parties on appeal, this court notes that the trial court granted MAT and Jenco attorney fees and costs based upon the granting of the permanent injunction. We vacate that order and remand the issue of attorney fees and costs to the trial court to reconsider the issue in light of this court's decision.
Judgment reversed and remanded for proceedings consistent with this opinion.
WALSH, J., concurs.
VALEN, J., dissents.
[1] MAT and Jenkins' assignment of error is proper under App.R. 3(C)(2) as it defends the trial court's judgment.
[2] Although the transaction underlying a L/C may be almost any kind of commercial or investment undertaking, we will use the term "underlying contract," only because the underlying transaction in the instant case is a contract for sale.
[3] The "independence principle" is adopted in Ohio by R.C. 1305.02(D):
 Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary.
[4] Each UCC Article governs a specific type of commercial transaction: Article 2, Sales; Article 2A, Leases; Articles 3 and 4, Negotiable Instruments and Banking; Article 4A, Fund Transfers; Article 5, Letters of Credit; Article 6, Bulk Transfers; Article 7, Warehousing and Carriage of Goods; Article 9, Secured Interests. These Articles are codified in Ohio by the chapters of R.C. Title 13.
[5] UCC Article 5 is codified in Ohio by R.C. Chapter 1305.
[6] Like other uniform laws, the UCP is not binding law. Nonetheless, banks traditionally have incorporated it into their international dealings, and, as discussed below, parties may make it the governing law in certain transactions. See Mantua Mfg. Co. v. Commerce Exchange Bank
(1996), 75 Ohio St.3d 1, 4-5.
[7] A standby L/C functions like the usual commercial L/C in that when the beneficiary presents conforming documents, the bank must pay the L/C. Unlike a commercial L/C, the standby letter of credit is used as a secondary source of payment in case the applicant fails to pay or perform under the contract. The independence principal and the doctrine of strict compliance (discussed below) function identically as to both types of letter of credit. See 3 White and Summers, Uniform Commercial Code (4 Ed. 1980), 112-117, Section 26-2.
[8] R.C. 1305.08 was amended effective July 1, 1998, to conform to changes in UCC 5-109. R.C. Chapter 1305 was repealed and reenacted to conform to revisions in UCC Article 5 at that time.
[9] The Ohio Supreme Court expressly declined to address this issue.Barclays Bank, 74 Ohio St.3d at 540, fn 4.
[10] The dissent finds a conflict between the UCP and the Revised Code as to the issues in this case. The dissent then interprets and enforces Revised Code provisions upon the L/C. But the L/C states that the UCP is its governing law. R.C. 1305.15(B) makes the UCP govern any conflict between the UCP and the Revised Code. The dissent's reliance upon the Revised Code is inappropriate, ignoring the text of R.C. 1305.15(B) and intent of the parties to the L/C.
[11] The dissent argues that the obligations of good faith under R.C. Chapter 1305 include obligations not included in the Chapter. The dissent believes that obligations of good faith included in other Chapters of R.C. Title 13 govern the L/C, including those governing the underlying contract. The dissent is correct that R.C. 1301.09 requires that every commercial transaction be performed in good faith. But the dissent fails to understand that the Revised Code imposes obligations within its specific R.C. Chapters applicable to each given type of commercial transaction. If the obligations underlying one type of commercial transaction were applicable to a different type of transaction, there would be no need to provide distinct obligations, tailored to the types of transactions and relationships between the parties.
[12] This statute was Alabama's codification of former UCC 5-114.
[13] The term "vitiation exception" is of this court's making, as it concisely describes the conclusion that the fraud must "vitiate the entire transaction."
[14] Both Roman Ceramics and Intraworld Industries concerned 12A P.S. section 5-114, Pennsylvania's codification of former UCC 5-114, allowing an injunction to issue for a "fraud in the transaction." Although this enactment arguably allowed an exception to the independence principle broader than under the UCP, the discussion of the exception and its limited nature is instructive in resolving whether such an exception applies, in any form, in the instant case.
[15] Roman Ceramics and Intraworld Industries involved UCC provisions.Szetjn was based upon pre-UCC/UCP common law. Read together, these cases arguably indicate that the vitiation exception might be universal, even though the text of UCP Articles 3 and 4 do not expressly provide for such an exception.
[16] The dissent concludes otherwise, stating that our interpretation
 does not go far enough. The independence principle, among other things, is for the protection of the bank. It ensures that the bank, in order to honor the letter of credit, look only to the four corners of the letter of credit and the documents presented independent of the underlying transaction. The bank may honor the letter of credit and act independently of the underlying transaction until enjoined by a court of competent jurisdiction as allowed by R.C. 1305.08(B).
The dissent fails to recognize that its wish to engraft obligations upon the parties that are not included in R.C. Chapter 1305 destroys the independence principle. This is most evident as to standby letters of credit, where the bank puts itself in direct financial risk. The effect of the dissent's argument — that the L/C is dependent upon good faith dealings in the underlying contract — creates a situation in which the bank must concern itself in the underlying contract, else the bank places itself in risk of financial harm. Because the bank would have to be involved with the underlying contract to ensure its own financial security, the effectiveness of the L/C as a means of doing business is nullified under the dissent's analysis.
[17] R.C. 1305.08(B) acts as Ohio's exception to the independence principle. To enforce this exception, a party must allege forgery or material fraud and then prove the four requirements of R.C.1305.08(B)(1)-(4), including that the party has met all conditions entitling him to relief under the law. Implicit in the vitiation exception discussed above is that the fraud proven is so extensive that no remedy at law will adequately protect the aggrieved party. Under Ohio law, before a party is entitled to injunctive relief, that party must prove that it is without an adequate remedy at law and that it will otherwise suffer irreparable harm. Haig, 62 Ohio St.3d at 510. Thus, where the fraud alleged does not vitiate both the underlying contract and the L/C there is an adequate remedy at law, namely, damages arising from the fraud in the underlying contract. When viewed in this light, it is apparent that R.C. 1305.08(B) is akin to the vitiation exception. Contrary to the dissent's view, there is no conflict between the UCP and the Revised Code.
[18] A pro forma invoice is not a binding document. It is a "memorandum invoice sent to a customer for his use or as a notice prior to actual shipment of goods." It is a document sent to "prescribe form or describe items." Webster's Third New International Dictionary, 1812 (1993). The final commercial invoice is the invoice binding the parties for the goods shipped.
[19] The dissent disagrees, stating that "[b]ecause R.C. 1305.08(B) specifically provides for injunctive relief, MAT and Jenkins need not demonstrate that they have no adequate remedy at law in order to obtain an injunction on the letter of credit." The dissent reaches this conclusion on the basis of State ex rel. Steckman v. Jackson (1994),70 Ohio St.3d 420, which held that R.C. 149.43(C), a public records statute, mandates that only a mandamus action can be maintained to secure public records, even where other remedies are available. Jackson relied upon Johnson v. United Enterprises, Inc. (1957), 166 Ohio St. 149, which held that R.C. 713.13 allowed an injunction to be issued in certain zoning cases, even though there were "other remedies provided by law." The statutes in those cases differ from R.C. 1305.08(B). R.C. 149.43(C)requires that a mandamus action be filed to secure public records, even if other remedies are available. R.C. 713.13 specifically allows injunctive relief, even if other remedies are available.
For an injunction to issue under R.C. 1305.08(B), a party must demonstrate that "[a]ll conditions to entitle a person to the relief under the law of this state have been met." R.C. 1305.08(B)(3). By its own language, R.C. 1305.08-(B)(3) incorporates the general requirement inHaig, 62 Ohio St.3d 507, that there be no adequate remedy at law before an injunction is granted. Jackson and Johnson have no application to R.C. 1305.08(B). The dissent reaches the opposite conclusion only by ignoring the text of R.C. 1305.08(B)(3).